**Donald KATZ, Trustee in Bankruptcy of Oakland Foundry Company of Belleville, Illinois, Inc., Plaintiff,**

v.

**FIRST NATIONAL BANK OF GLEN HEAD, Defendant.**

No. 73 C 1051.

United States District Court,
E. D. New York.

Oct. 19, 1976.

Emil, Kobrin, Klein & Garbus, New York City, for plaintiff.

Weil, Gotshal & Manges, New York City, for defendant.

## MEMORANDUM AND ORDER

GEORGE C. PRATT, District Judge.

On June 30, 1971, defendant bank exercised its right of set-off against a checking account having a balance in favor of Oakland Foundry of Belleville, Illinois, Inc. in the amount of $108,783.91. These funds were applied against Oakland's indebtedness to the bank in the amount of $125,000. Fifteen days later, on July 15, 1971, an involuntary petition in bankruptcy was filed against Oakland in the United States District Court for the Eastern District of Illinois. Plaintiff seeks to invalidate that set-off as a voidable preference under 11 U.S.C. § 96.

The following facts are undisputed, having been expressly asserted by defendant for purposes of the motion under local rule 9(g) and expressly admitted by plaintiff in his answering papers:

1. On or about January 16, 1969, in consideration of a loan from the Bank in the amount of $125,000, Oakland Foundry of Belleville, Illinois, Inc. ("Oakland") executed a promissory note in favor of the Bank for the sum of $125,000. The promissory note matured on April 16, 1969 and was thereafter renewed quarterly until June 18, 1970, when Oakland's obligation was made payable on demand. Affidavit of Anthony D. Famighetti, ¶ 2, Exhibit A ("Affidavit"), sworn to June 23, 1976.

2. Electronic Cabinets, Inc., Herman Brede and his wife, Betty D. Brede, guaranteed Oakland's indebtedness to the Bank. Affidavit, Exhibit B. The Bank ordinarily required a personal guaranty on a corporate borrowing by a small, individually held corporation such as Oakland. Without a personal guaranty, the Bank would not have made the loan to Oakland. Affidavit, ¶ 3.

3. In addition, Oakland secured its indebtedness and the guarantors secured their obligation by pledging with the Bank all of the stock of Electronic Cabinets, Inc. and H. W. Brede Co., Inc. Affidavit, ¶ 4; Transcript of Testimony of Herman W. Brede, October 12, 1971 ("Brede Testimony"), at 7.

4. Oakland was a wholly-owned subsidiary of Electronic Cabinets, Inc., and Mr. & Mrs. Brede were the sole stockholders of Electronic Cabinets, Inc. and of H. W. Brede Co., Inc. Brede Testimony, at 14–15. Mr. Brede was the president and chief executive officer of Oakland. Brede Testimony, at 5.

5. On June 18, 1970, at the time the parties converted Oakland's promissory note to a demand note, Mr. & Mrs. Brede gave the Bank additional security in the form of a second mortgage on their residence. Affidavit ¶ 6, Exhibit D.

6. At the time of the Bank's loan to Oakland, Oakland opened a general checking account with the Bank (the "Glen Head Account"). Affidavit, ¶ 7, Exhibits E and F. The Glen Head account was a general account, and there were no restrictions on Oakland's right to make withdrawals. Affidavit, ¶ 7.

7. Oakland maintained accounts at the St. Clair National Bank of Belleville, Illinois (the "St. Clair Account") and the Trade Bank & Trust Company of New York. Affidavit, ¶ 8; Brede Testimony, at 8–9.

11. Oakland made deposits in the total amount of $47,738.56 in April of 1971, $48,105.05 in May of 1971, and $12,075.21 in June of 1971. Affidavit, Exhibit H.

12. In "June or July", Herman W. Brede, President of Oakland, telephoned Anthony D. Famighetti at the Bank in order to advise that Oakland was in "financial trouble". In that conversation, Mr. Bre-

de stated that he "was going to talk to the other creditors to tell them that [he] was in trouble * * * [and] was still trying to work [his] way out of it." Brede Testimony, at 10–12.

13. The foregoing conversation between Mr. Brede and Mr. Famighetti, then the Bank's President (now Chairman of the Board and Chief Executive Officer), occurred on June 29, 1971. Affidavit, ¶ 14, Exhibit I.

14. As a result of the conversation between Mr. Brede and Mr. Famighetti on June 29, 1971, the Bank, on June 30, 1971, setoff Oakland's funds in the Glen Head Account on June 30, 1971, which totalled $108,783.91. These funds were applied against Oakland's indebtedness to the Bank in the amount of $125,000.00. Affidavit, ¶ 15, Exhibits J and K.

15. On July 15, 1971, an involuntary petition in bankruptcy was filed against Oakland in the United States District Court for the Eastern District of Illinois. Plaintiff's Answers to Defendant's Interrogatory No. 1. Subsequently, Oakland was adjudged bankrupt on August 18, 1971. Complaint, ¶ 5.

16. Donald Katz, the plaintiff herein, was appointed trustee in bankruptcy for the Oakland estate on or about October 12, 1971. Complaint, ¶ 5.

17. On October 12, 1971, counsel (now counsel to the trustee) for the receiver (now trustee) of the Oakland estate examined Mr. Brede, Oakland's President, in the bankruptcy court, under oath pursuant to Section 7a(10) of the Bankruptcy Act, 11 U.S.C. § 25(a)(10).

For purposes of this motion I have assumed that at the time of the set-off Oakland was insolvent and that the bank had reasonable grounds to believe that Oakland was insolvent. Since the set-off was by definition for the benefit of a creditor, the bank, on account of an antecedent debt, since it occurred within four months of bankruptcy, and since its effect enabled the bank to obtain a greater percentage of its debt than other creditors of the same class, it follows that all the elements of a voidable

preference under § 96 are present *if* the set-off itself constituted a "transfer" of Oakland's property.

The general law has been accurately summarized in 4 Collier on Bankruptcy § 68.16 as follows:

The general rule may first be stated that where an insolvent depositor makes general deposits within four months of his bankruptcy, which deposits are accepted in good faith and in the regular course of business, the bank has a right to setoff such deposits against an obligation owing to it by the depositor. Obviously, where the bank has no knowledge or imputation of knowledge, or "reasonable cause to believe," that the depositor is insolvent, such routine deposits are clearly available as set-offs. *But even though the depositor was insolvent and knowledge of this fact could be charged against the bank at the time when the deposit was made, the bank is still entitled to apply the deposit on its claim, so long as it was accepted in good faith, in the ordinary course of business.* It is only where affairs have reached such a point that the bank accepts the deposit for the purpose of payment, or of giving itself a subsequent advantage over other creditors through its right of set-off, or for some other special purpose, that the deposit and the subsequent application of it amounts to a recoverable preference. (At pp. 917–920.-1; emph. supp.)

A few pages later, discussing the requirement that the deposits be accepted in good faith and in the ordinary course of business, the author further states:

The usual general deposits made on an open checking account subject to withdrawal at will constitute the type of deposits which will more often be considered above suspicion. But if the deposits are not accepted in the ordinary course of business, or are procured, accepted or "built-up" for the real purpose of permitting the bank to obtain a set-off, the deposits will be considered voidable preferential transfers and the right of set-off is lost. (At pp. 923–925).

In *Jensen v. State Bank of Allison*, 518 F.2d 1 (C.A.8 1975), the bankruptcy trustee sought to vacate a set-off by the bank. As here, there was no evidence of the bank's complicity in a build-up of the depositor's account, or that the deposits had been accepted in order to permit the bank to obtain a preference. The account was one of long standing. The court noted that "[u]nder the Bankruptcy Act, no voidable preference is ordinarily created when a bank sets off funds in an account of general deposit with it against the debt owed it by the depositor". 518 F.2d at 4.

In *Farmers Bank v. Julian*, 383 F.2d 314, 324 (C.A.8 1967), the court stated:

Section 68(a) of the Bankruptcy Act, 11 U.S.C. § 108, applies and allows a setoff to [a] Bank unless the account has been accepted or built up for the real purpose of permitting the Bank to obtain a preference by way of setoff of the account. A bank account at the time of filing the petition in bankruptcy is a debt due to the bankrupt from the bank, and in the absence of fraud or collusion between the Bank and the bankrupt, the Bank may set the account off against any indebtedness owed it by the bankrupt. * * * The bank has the right to set off deposits against indebtedness even though the bankrupt is insolvent at the time of set-off and before the petition in bankruptcy is filed.

Further in *Farmers Bank v. Julian, supra,* the court stated the issue as follows:

The issue is: Was the account of the bankrupt built up, *with the understanding of the Bank,* for the purpose of allowing the Bank to use it as an offset and thereby obtain a preference? 383 F.2d at 324 (emph. supp.).

In the present case Herman Brede, President of Oakland, had personally guaranteed, together with his wife, the corporate obligations to the bank. From the fact that approximately $107,000 was deposited by Oakland in the general checking account in the bank, one might infer that Brede had intended to make those funds available for a set-off in the event of a bankruptcy. The

key to the problem here, however, is that there is nothing presently in the record or which might be available to the plaintiff on a trial to show any complicity by the bank in such an intention.

Insofar as the bank's actions are concerned, up until June 30, 1971, when its right of set-off was exercised, the funds which had been deposited by Oakland in its open checking account were available for withdrawal. There is nothing to show that the bank engaged in any collusion with Brede or Oakland, that it in any way isolated or liened the funds in Oakland's checking account, or treated the transactions in any way different from any other general checking account. Under such circumstances the bank had a right of set-off and its exercise thereof did not constitute a voidable preference.

Pinpointing the issue somewhat more narrowly, the cases seem to say that a bank's set-off of a general checking account will not constitute a voidable preference if the deposits were built-up or accepted in the regular course of business. The question arises: whose business? the bank's? or the depositor's? The trustee argues that this setoff must be voided if the deposits were not made by Oakland in the regular course of its business. I disagree, and for purposes of this motion, I have assumed that the deposits were *not* made by Oakland in the ordinary course of its business, but were instead made either to isolate funds from its Illinois creditors, or to place funds within easy reach of the bank's right of a set-off, which, if exercised, would reduce Brede's potential liability on his personal guarantee to the bank.

Such action by the depositor alone is not enough to constitute a voidable preference. The test is not whether the deposits were made in the depositor's regular course of business, but instead, whether they were accepted by the bank in its regular course of business. Viewed in that light, there is nothing in the record by which the trustee could establish on a trial that these deposits were received by the

bank in anything other than its ordinary course of business. The funds were kept available in the checking account, ready to be withdrawn any time up until the right of set-off was exercised.

Upon the oral argument plaintiff's attorney conceded that if on the law relief required the bank's involvement in the build-up of the account, and if there was nothing in the papers before the court to create a question of fact as to the bank's participation, collusion or complicity in a plan by Brede to prefer the bank over other creditors, then summary judgment would have to be granted to the defendant. I have reviewed the papers submitted on the motion, including both the affidavit and deposition of Anthony D. Famighetti, president of the bank, and conclude that neither anything in the papers nor in Mr. Famighetti's testimony raises any issue of fact on that key question.

None of the cases cited by plaintiff involves situations where a set-off was invalidated in the absence of evidence indicating that the bank had received the deposits in a manner not constituting the ordinary course of business. Since plaintiff has been able to produce no such evidence here and indeed has conceded that all the evidence available to him is presently before the court, no purpose would be served by permitting this case to go to trial.

Brede having disappeared, as noted by plaintiff's counsel on the argument, his testimony would not be available on a trial. Accordingly, summary judgment in favor of the defendant dismissing the complaint must be granted.

SO ORDERED.